UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――

| KEEP ON KICKING MUSIC, INC., *et al.*, | |
|---|---|
| Plaintiffs, | 23-CV-4400 (JPO) |
| -v- | OPINION AND ORDER |
| UNIVERSAL MUSIC PUBLISHING GROUP, *et al.*, | |
| Defendants. | |

J. PAUL OETKEN, District Judge:

Plaintiffs Keep on Kicking Music, Inc., Keep on Moving Music, Inc., and Free World Music, Limited (collectively, "Plaintiffs") bring this action for copyright infringement against several defendants. Multiple parties in the case claim rightful ownership over the musical composition and sound recording at issue, "Espoir Composition X," or "ECX." Before the Court is Defendants Kreyol Music, Inc.'s and Melodie Makers, Inc.'s motion to dismiss the complaint for lack of personal jurisdiction and under the doctrine of *forum non conveniens*. For the reasons that follow, the motion to dismiss is denied.

I.   **Background**

   A.   **Factual Background**

Unless otherwise noted, the following facts are taken from the First Amended Complaint and are assumed to be true for the purposes of considering the motion to dismiss. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

This case concerns the ownership of a musical composition and sound recording entitled "Espoir Composition X," or "ECX." (ECF No. 15 ("FAC") ¶ 2.) ECX was first recorded by Robert Pierre Martino in 1978. (*Id.* ¶ 28.) It was released that year under the label Cinedisc, as

part of an album by Martino's band, Les Difficiles de Petion-Ville. (*Id.*) A complicated chain of ownership followed. Martino registered ECX in France in 2000 in the French professional association that collects and distributes music royalties, Societe des Auteurs, Compositeurs et Editeurs de Musique, or "SACEM." (*Id.* ¶ 29.) The Plaintiffs allege that, through "written agreements with Mr. Martino," they "acquired ownership of the compositions, subject to a royalty obligation to Mr. Martino. (*Id.*) They also registered their ownership with the United States Copyright Office in 2021 and in 2023. (*Id.*)

At the same time, Idaly, a music licensing company, entered into agreements permitting the Universal Defendants to sample ECX in the song "Narcos" by the musical group Migos. (*Id.* ¶ 30.) That song was released as part of Migos's album in 2018. (*Id.* ¶ 31.) But other Defendants Kreyol Music and Melodie Makers, Inc. ("Kreyol and Melodie") claim that they are the proper owners of the publishing and sound recording rights to the musical work ECX. (ECF No. 59 ("Mem.") at 4-7.) Kreyol and Melodie assert ownership to ECX through another complex chain of succession, largely in Haiti, from the 1960s through 2018. (*Id.*) And when Kreyol and Melodie were contacted by New York attorney Daniel Rubin, informing Kreyol and Melodie of Idaly's license agreement, Kreyol and Melodie entered into a new agreement with Idaly to divide the royalties from the license to the Universal Defendants. (ECF No. 68 ("UMG Mem. Opp.") at 1; ECF No. 78 ("Reply") at 2-3.) On behalf of Kreyol and Melodie, Rubin entered into an agreement with Idaly—the Joint Ownership and Administration Agreement— under which Kreyol and Melodie were to receive a portion of the royalties from the Universal Defendants' use of ECX. (UMG Mem. Opp. at 1; ECF No. 71-1 ("Joint Agreement").) Kreyol allegedly received those payments through the New York office of Sample Clearance, the

business operated by Rubin for the purpose of negotiating sample license agreements and collecting royalties on behalf of copyright owners. (UMG Mem. Opp. at 5.)

### B. Procedural Background

Plaintiffs filed a complaint alleging copyright infringement on May 26, 2023. (ECF No. 7.) This Court referred the case to Magistrate Judge Barbara C. Moses for General Pretrial matters on May 30, 2023. (ECF No. 8.) Plaintiffs amended their complaint on October 2, 2023. (FAC.) The Universal Defendants filed an answer, together with crossclaims against Kreyol and Melodie and a counterclaim against Plaintiffs, on October 20, 2023. (ECF No. 29.) Plaintiffs filed a reply to the Universal Defendants' counterclaim on November 3, 2023. (ECF No. 36.) Plaintiffs obtained a certificate of default with respect to Defendant Idaly on January 12, 2024. (ECF No. 52.) Kreyol and Melodie filed their motion to dismiss for lack of personal jurisdiction and under the doctrine of *forum non conveniens* (ECF No. 58), and the accompanying memorandum of law supporting the motion to dismiss (Mem.), on February 27, 2024. The Universal Defendants filed their memorandum of law in opposition to the motion to dismiss on March 25, 2024, as did Plaintiffs on March 25, 2024 (ECF No. 74 ("Mem. Opp.")). Kreyol and Melodie filed their reply memorandum of law in support of the motion to dismiss on April 12, 2024.

## II. Legal Standards

### A. Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). Where, as here, there has been no "full-blown evidentiary hearing on the motion, the plaintiff need make

only a *prima facie* showing of jurisdiction." *Id.* (quoting *Bank Brussels*, 171 F.3d at 784). At this "preliminary stage," a *prima facie* showing sufficient to defeat a Rule 12(b)(2) motion "may be established solely by allegations" pleaded in good faith. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt*, S.A., 902 F.2d 194, 197 (2d Cir. 1990)). The allegations, though, must be more than "conclusory statement[s]"; rather, they must state specific "facts supporting th[e] conclusion" that jurisdiction is proper. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998).

**III.   Discussion**

   **A.   Personal Jurisdiction**

Kreyol and Melodie first argue that the Court lacks personal jurisdiction over them in this action.[1] Federal courts exercise two forms of personal jurisdiction: specific (or "case-linked") and general (or "all-purpose"). *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 592 U.S. 351, 358 (2021) (citing *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)). While general personal jurisdiction permits the defendant to be sued in the forum on any claim, specific personal jurisdiction permits the defendant to be sued for only those claims which on their own satisfy jurisdictional requirements. *Ford*, 592 U.S. 358-59. Accordingly, when

---

[1] Though Kreyol and Melodie are formally separate entities, they share offices and are owned and operated by the same person. (Mem. at 4.) No one has made an argument for considering them separately for jurisdictional purposes, and in fact, Kreyol and Melodie frequently refer to their business dealings and impressions collectively. (*See, e.g.*, Mem. at 7.) ("All of Kreyol Music and Melodie Makers's business dealings with Mr. Martino took place primarily in Florida."); (*id.* at 10) ("Kreyol Music and Melodie Makers believed that the ownership issue was one of Haitian law when they sought to ratify their publishing and sound recording rights in *Viva les Difficiles* in 2018."); (*id.* at 12) ("With respect to music rights management matters, Kreyol Music and Melodie Makers primarily deal with BMI's offices in Nashville, Tennessee."). Because Kreyol and Melodie do not contest the characterization of their contacts as the same for jurisdictional purposes, and because the allegations of all parties portray the business relationship between them as *at least* rising to the level of agency, the Court proceeds under such an understanding for the purposes of resolving the motion to dismiss.

general personal jurisdiction is at issue, the analysis centers on the relevant locations of the defendant's business. But when specific personal jurisdiction is at issue, the analysis centers on the defendant's particular alleged activities giving rise to the claims in the case.

In federal court, "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located . . . ." Fed. R. Civ. P. 4(k)(1)(A).[2] Thus, this Court's exercise of personal jurisdiction is constrained by both the federal Due Process Clause and New York's personal jurisdiction statute, C.P.L.R. § 302(a)(1). As to the second requirement, New York state courts' interpretations of the statute control. *See, e.g.*, *It. Exhibition Group USA, Inc. v. Bartolozzi*, No. 23-CV-4417, 2024 WL 291224 (citing New York state court decisions to interpret § 302(a)(1)).

1. **General Personal Jurisdiction**

Under the Due Process Clause, "[a] state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford*, 592 U.S. at 358 (citing *Goodyear*, 564 U.S. at 919). Typically, defendants are at home in only two types of forums: where they are incorporated and where they have their principal place of business, though in an "exceptional case," a corporation may be subject to general personal jurisdiction elsewhere. *Id.* at 359 (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 & 139 n.19 (2014)). No one here argues that Kreyol and Melodie—incorporated and having their principal places of business in Florida—are

---

[2] Importantly, and contrary to some of Kreyol's and Melodie's arguments, Rule 4 uses "general" to refer to ordinary state courts of plenary jurisdiction, rather than to create a requirement that every federal defendant be subject to general personal jurisdiction in the state in which the federal court sits. *See* Notes of Advisory Committee on Rules—1993 Amendment, Rule 4 ("Subdivision (k) . . . explicitly authoriz[es] the exercise of personal jurisdiction over persons who can be reached under state long-arm law . . . .").

constitutionally subject to general personal jurisdiction in New York.  Nor could they be, since even in the exceptional case, far more is required in Kreyol's and Melodie's contacts with New York than those alleged here.  *Cf. Daimler*, 571 U.S. at 130 n.8 (summarizing the defendant's extensive forum state activities and extenuating circumstances that permitted general personal jurisdiction in the "exceptional" case of *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)).  Accordingly, this Court may not exercise general personal jurisdiction over Kreyol or Melodie.

### 2. Specific Personal Jurisdiction

That leaves specific personal jurisdiction, which, like general personal jurisdiction, is governed by both the Due Process Clause and New York's "long-arm" statute, C.P.L.R. § 302(a)(1).  Plaintiffs must satisfy the requirements of both as to "*each* claim" against Kreyol and Melodie in order to proceed against them here.  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original).

#### a. New York C.P.L.R. § 302(a)

In relevant part, New York's long-arm statute enumerates acts which may form "the basis of jurisdiction" including when "any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state . . . ."  N.Y. C.P.L.R. § 302(a)(1).

The New York Court of Appeals has explained that, under § 302(a), "[e]xamination of a defendant's actions in New York is primarily a fact-based inquiry that requires an assessment of whether the non-domiciliary's activities in the state were purposeful . . . ."  *State v. Vayu*, 39 N.Y.3d 330, 332 (2023) (citing *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 376 (2014)).  "Purposeful activities . . . are volitional acts by which the non-domiciliary avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and

protections of its laws." *Id.* (internal quotation marks omitted).  Importantly, "[t]he lack of an in-state physical presence is not dispositive of the question whether a non-domiciliary is transacting business in New York." *Paterno*, 24 N.Y.3d at 376.  "Regardless of whether by bricks and mortar structures, by conduct of individual actors, or by technological methods . . . a non-domiciliary transacts business when . . . the non-domiciliary projects himself or herself into this state to engage in a sustained and substantial transaction of business." *Id.* at 376-77 (internal quotation marks and brackets omitted).

Here, Plaintiffs have made a *prima facie* showing that Kreyol and Melodie, through their agent Rubin, "transact[ed] any business within the state or contract[ed] . . . to supply goods or services in the state . . . ."[3]  For example, UMG alleges—and submits documentation purporting to show—that "Idaly and Kreyol entered into a Joint Ownership and Administration Agreement" identifying them as joint owners of the sound recording at issue in this case and identifying "Kreyol's office address" as one in Dix Hills, New York.  (UMG Mem. Opp. at 4.; Joint Agreement at 1.)  The Joint Agreement also includes a clause that it "shall be governed by and . . . construed under the laws of the State of New York."  (Joint Agreement ¶ 9; UMG Mem. Opp. at 4.)  And finally, UMG alleges that the agreement provided for the payment of royalties to Kreyol and that Kreyol accepted them through Rubin, its New York agent, at his New York address.  (UMG Mem. Opp. at 5; ECF No. 70-2.)

---

[3] UMG also alleges that, § 302(a)(1) aside, Kreyol is subject to personal jurisdiction in New York at least with respect to UMG's crossclaim for unjust enrichment arising from Kreyol's acceptance of royalty payments, since "Kreyol accepted those payments through its agent in New York, Sample Clearance Limited." (UMG Mem. Opp. at 9.)  *Cf.* N.Y. C.P.L.R. § 302(a)(2). Because there is sufficient basis for personal jurisdiction over Kreyol and Melodie with respect to both the declaratory judgment claim and the unjust enrichment claim under § 302(a)(1), the Court need not consider whether the acceptance of royalties on its own would permit an exercise of specific jurisdiction.

In fact, Kreyol and Melodie all but concede this issue in their first Memorandum, explaining that "[t]he cases in which personal jurisdiction has been found based on a defendant's licensing agreement with a clearinghouse have been based on a finding of *specific* jurisdiction, under C.P.L.R. § 302(a)." (Mem. at 12-13 (citing six cases as examples).)  Kreyol and Melodie did not make arguments against specific personal jurisdiction until their reply.  In any event, that Kreyol and Melodie appointed a New York agent to negotiate a contract in New York and accept royalty payments for the work at issue in this case to the agent's New York office is sufficient to constitute transacting business or contracting to supply goods or services in the state.  Accordingly, the Court concludes that exercising specific personal jurisdiction over Kreyol and Melodie in this action comports with the requirements of § 302(a).

### b.     Due Process Clause

Exercises of specific personal jurisdiction, even when authorized by state statute, must still satisfy the Due Process Clause.  That requires that the defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945) (quotation marks omitted).  "Minimum contacts" include acts by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State." *Ford*, 592 U.S. at 359 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  Rather than being "random, isolated, or fortuitous," *id.* (quoting *Keeton v. Hustler Mag.*, 564 U.S. 770, 774 (1984)), the contacts "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there," *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (brackets in original).

8

Moreover, the specific claims at issue must "relate[] to or 'arise[] out of' a defendant's contacts with the forum . . . ." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). While that requirement is certainly satisfied by a "strict causal relationship between the defendant's in-state activity and the litigation," it may also be satisfied by a "relationship among the defendant, the forum[s], and the litigation" that is "close enough to support specific jurisdiction." *Ford*, 592 U.S. at 362, 371. And finally, any exercise of personal jurisdiction must not "offend 'traditional notions of fair play and substantial justice.'" *Asahi Metal Ind. Co., Ltd. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987) (quoting *Int'l Shoe*, 326 U.S. at 316). "[T]he determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors," including "the burden on the defendant, the interests of the forum State, . . . the plaintiff's interest in obtaining relief, . . . 'the interstate judicial system's interest in obtaining the most efficient resolution of the controversies[,] and the shared interest of the several States in furthering administrative social policies.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. 286, 292 (1980)).

As for minimum contacts, "[i]t is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'" *Okla. Firefighters Pension & Retirement Sys. v. Banco Santander (México) S.A. Institución de Banca Múltiple*, 92 F.4th 450, 457 (2d Cir. 2024) (quoting *Schwab*, 883 F.3d at 84). That applies even "where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" *Schwab*, 883 F.3d at 85 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).

9

Though the cases where specific personal jurisdiction turns on an agency relationship "have not clearly delineated the showing necessary before an agent's contacts will be imputed to its principal," the "caselaw provides some guidance." *Schwab*, 883 F.3d at 85. For example, the *Schwab* court cited a prior case in which the Second Circuit held that a senior partner-junior partner relationship in which the junior partner was performing an "assignment over which the senior retains general supervision . . . would permit jurisdiction" over the senior partner for claims arising out of that assignment. *Id.* (citing *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1333-34 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 272-73 (2010)). Or take *Schwab* itself, in which the Second Circuit held that personal jurisdiction may be supported by plausible allegations of "an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf . . . in a state in which the parent 'indirectly' sells the securities." 883 F.3d at 85-86. The problem for the plaintiffs in *Schwab*, however, was that the plaintiff had failed to plead a sufficient factual basis to sustain a finding of agency. *Id.* at 86. But recently, in *Oklahoma Firefighters*, the Second Circuit approved agency-based specific personal jurisdiction, holding that the plaintiff had sufficiently alleged a relationship wherein "each Defendant maintained a New York sales staff assigned to serve customers in the United States and that the Mexico-based [Defendants] were in constant communication with their respective salesforce in the United States." 92 F.4th at 457 (internal quotation marks and citations omitted). Because the defendants in that case "actively used" the New York representatives "as mere pass-throughs to execute transactions on Defendants' behalf," they could be subject to personal jurisdiction in New York. *Id.* The throughline is that "[t]he defendant's knowledge of, control over, and benefit from the agent's conduct are the key considerations." *Id.* at 459.

Perhaps most on-point—and cited favorably in *Oklahoma Firefighters*—is *PDK Labs v. Friedlander*, another Second Circuit case concerning the jurisdictional effects of an in-state agent's actions. 103 F.3d 1105, 1111 (2d Cir. 1997). There, the plaintiff sought a declaratory judgment in the Southern District of New York establishing that the defendant had no right to enforce a patent against the plaintiff. *Id.* at 1107. The defendant had not personally marketed or sold any product under his patent in New York but had sought "investments in the development of his . . . product and negotiat[ed] royalty agreements with alleged violators of his patents." *Id.* at 1109. Significantly, the defendant conducted that activity through an attorney agent, who "represented [the defendant] in these pursuits in New York" and corresponded with prospective business partners "by phone and letter from his firm's New York City office, purportedly to negotiate a settlement of [the defendant's] legal claims." *Id.* The court concluded that the defendant's "using [an agent] in New York . . . to advance his interest . . . through soliciting funds and negotiating royalty agreements" constituted minimum contacts sufficient to support specific personal jurisdiction in New York. *Id.* at 1110.

Here, Plaintiffs have made a sufficient *prima facie* showing of minimum contacts with New York and that this action arises out of those contacts. Though Plaintiffs reference a variety of purported contacts between Kreyol and Melodie and New York, they boil down to essentially one: Kreyol's and Melodie's conduct of business through their New York agent, Rubin, who allegedly negotiated the Joint Agreement among Kreyol, Melody, and Idaly and provided a New York address for correspondence and the payment of royalties. That arrangement, as alleged by the Plaintiffs and largely uncontested by Kreyol and Melodie, comprises knowledge, control, and benefit as required by the Due Process Clause.

11

Kreyol and Melodie concede that they *knew* of Rubin's and Sample Clearance's activities, writing in their reply, "Kreyol Music retained Mr. Rubin to handle this sampling copyright infringement matter" and "Sample Clearance used its address in agreements that it negotiated for Kreyol Music solely for convenience purposes for collecting money for the infringement of the work ECX, as would any clearance organization."  (Reply at 3.)  Kreyol and Melodie also concede that they *benefited* from those activities, writing, "After Kreyol Music alerted the Universal Defendants to its claim, it reached a compromise with Idaly Publishing. As part of its management of this issue for Kreyol Music, Sample Clearance negotiated an agreement with Idaly Publishing which Kreyol Music assented to . . . ." (*Id.* at 3.)  And finally, Kreyol and Melodie concede that they *controlled* those activities, writing, "Kreyol Music retained Sample Clearance to handle the infringement matter . . . [which] used its address in agreements that it negotiated for Kreyol Music solely for convenience purposes for collecting money owed to Kreyol Music for the infringement of the work *ECX* . . . ." (*Id.* at 11.)  In other words, Kreyol and Melodie knowingly retained Sample Clearance—led by Rubin—to negotiate an agreement concerning the subject matter of this litigation, and to receive royalties related to it, at a New York office.  And in forming such an agreement, they specified that New York law would govern any disputes that arose under it.  Much like in *PDK Labs* and *Okla. Firefighters*, Kreyol and Melodie made use of an in-state agent to knowingly enter into beneficial transactions.  They entered such an agreement purporting to hold rights in a song that is now the subject of this litigation.  And they directed royalty payments on those rights to the office of their New York agent.  Those acts constitute "minimum contacts."  And this declaratory judgment and unjust enrichment action arise from those contacts, as they concern ownership of the rights and legality of the royalty payments.

12

Moreover, exercising personal jurisdiction over Kreyol and Melodie in New York comports with "traditional notions of fair play and substantial justice." New York has an interest in hearing cases in its courts concerning the negotiation of contracts and acceptance of royalty payments through New York agents. And while it may not be the most convenient for Kreyol and Melodie to defend here, it will not create a substantial hardship, as they are American companies that have already done business through attorneys in New York. *Cf. Asahi*, 480 U.S. at 114 ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."). Considerations of fairness do not overcome Plaintiffs' legitimate choice of forum in this case. Accordingly, the Court concludes the Due Process Clause authorizes its exercise of specific personal jurisdiction over Kreyol and Melodie.

Kreyol's and Melodie's motion to dismiss for lack of personal jurisdiction is denied.

### B.     *Forum Non Conveniens*

Kreyol and Melodie also move to dismiss the case under the doctrine of *forum non conveniens*. "That doctrine affords a trial court discretion in a case over which it has jurisdiction to decline to exercise it, whenever it appears that such case may be more appropriately tried in another forum, either for the convenience of the parties or to serve the ends of justice." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003). In considering a motion for dismissal under *forum non conveniens*, courts are to proceed in three steps: "(1) determine the degree of deference properly accorded the plaintiff's choice of forum; (2) consider whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) balance the private and public interests implicated in the choice of forum." *Aenergy, S.A. v. Repub. of Angola*, 31 F.4th 119, 128 (2d Cir. 2022) (quoting *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 145 (2d Cir. 2022)). None of that analysis is required here, however, because

Plaintiffs have improperly requested dismissal under *forum non conveniens* to another federal forum, and have waived any request for venue transfer by not including it in their original motion to dismiss.

In their motion and supporting memorandum, Kreyol and Melodie make mention of two other jurisdictions that purportedly have a closer connection to the subject matter of this litigation than the Southern District of New York: Haiti and Florida. Despite the reference to Haiti, however, the only "adequate alternative forum" Kreyol and Melodie cite is "[t]he courts in the State of Florida." (*Id.* at 16.) At no point in their Memorandum do Kreyol and Melodie contemplate conducting this action in Haiti; all of the references to Haiti are merely included to support conducting the action in Florida.

That raises a different problem. The *forum non conveniens* doctrine permits dismissals to courts *outside* of the United States, rather than to other federal courts. As the Supreme Court explained, "§ 1404(a) transfers are different than dismissals on the ground of *forum non conveniens*. Congress enacted § 1404(a) to permit change of venue between federal courts. Although the statute was drafted in accordance with the doctrine of *forum non conveniens*, it was intended to be a revision rather than a codification of the common law." *Piper Aircraft Co. v. Reno*, 454 U.S. 235, 264-65 (1981) (internal citation omitted). The Second Circuit has confirmed this reading of *Piper*: "Section 1404(a) cases are transferred to a more convenient federal forum; *forum non conveniens* cases are dismissed in anticipation of re-filing in a more convenient foreign forum." *Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 607 (1998) (citing 5 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3823 (1986)); *see also Kintetsu World Express (U.S.A.), Inc. v. Dialectic Distribution LLC*, No. 21-CV-9579, 2022 WL 17787354 (S.D.N.Y. Dec. 19, 2022)

("[T]he common law doctrine of *forum non conveniens* is inapplicable to the present case [because] § 28 U.S.C. § 1404(a) . . . displaced 'the common law doctrine of *forum non conveniens* for transfers between the United States district courts.'") (quoting *Capital Currency Exchange*, 155 F.3d at 607). By the time Kreyol and Melodie requested venue transfer under 28 U.S.C. § 1404 in their reply, the argument was waived. *See In re Fosamax Prods. Liability Litig.*, No. 06-MD-1789, 2013 WL 6669706, at *3 (S.D.N.Y. Dec. 18, 2013) (discussing the general rule that new arguments may not be raised in reply briefs); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) (similar).

But "even if the Court were to construe [Kreyol's and Melodie's] motion to dismiss as a motion under § 1404(a) to transfer to [the Southern District of Florida], it concludes that the standard under that statute is not satisfied." *Kintetsu World Express*, 2022 WL 17787354, at *3. In their original memorandum, Kreyol and Melodie fail to argue an essential element of § 1404(a) transfer: that the Universal Defendants are subject to personal jurisdiction in the desired transferee forum. *See* 28 U.S.C. § 1404(a) (permitting transfer to only those districts "where [the action] might have been brought"). By the time Kreyol and Melodie filed their reply, they were on notice of the need to establish personal jurisdiction in the transferee district. (*See* UMG Mem. Opp. at 12-13). But in that reply, Kreyol and Melodie argue only that the Universal Defendants maintain an office in Florida, that Migos performed the song Narcos at least once in Florida, and that the song has been distributed over the internet to many jurisdictions. (Reply at 19-20.) Those arguments, without more, are insufficient to establish that personal jurisdiction lies in this action over the Universal Defendants in Florida.

15

Accordingly, Kreyol's and Melodie's motion to dismiss under the doctrine of *forum non conveniens* is denied. The request for transfer of venue under 28 U.S.C. § 1404(a), raised for the first time in the reply, was waived and is otherwise insufficient.

## IV. Conclusion

Kreyol's and Melodie's motion to dismiss for lack of personal jurisdiction and under the doctrine *forum non conveniens* is DENIED.

Defendants shall file an answer to the first amended complaint and crossclaims within 14 days after the date of this opinion and order. *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motions at ECF Number 58.

SO ORDERED.

Dated: August 5, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge